## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| LEE NAMIOTKA, Derivatively on Behalf of Nominal Defendant GENERAL MOTORS COMPANY, | ) ) ) | |
| | ) | Case No. _____ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MARY T. BARRA, PAUL A. JACOBSON, WESLEY G. BUSH, JOANNE C. CREVOISERAT, LINDA R. GOODEN, JOSEPH JIMENEZ, JONATHAN MCNEILL, JUDITH A. MISCIK, PATRICIA F. RUSSO, THOMAS M. SCHOEWE, MARK TATUM, JAN E. TIGHE, DEVIN N. WENIG, ANEEL BHUSRI, CAROL M. STEPHENSON, MARGARET C. WHITMAN, JANE MENDILLO, DOUG L. PARKS, CRUISE LLC, KYLE VOGT, DANIEL AMMANN, and WAYNE G. WEST, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| GENERAL MOTORS COMPANY, | ) ) | |
| Nominal Defendant. | ) ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Lee Namiotka ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant General Motors Company ("GM" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter*

*alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding GM, legal filings, news reports, securities analysts' reports about the Company, the securities class action *In re General Motors Company Securities Litigation*, 4:23-cv-13132-SDK-EAS (D. Del.) (the "Securities Class Action"), and other publicly available information.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action brought by Plaintiff on behalf of GM against certain current and former officers and members of the Company's Board (the "GM Defendants"),[1] Cruise LLC ("Cruise"), and certain executives of Cruise (the "Cruise Defendants"),[2] for breaches of their fiduciary duties to the Company and its stockholders between February 24, 2021 and November 8, 2023 (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2.      Incorporated in 2009, GM designs, builds, and sells trucks, crossovers, cars, and automobile parts and provides software-enabled services and subscriptions worldwide.

3.      The Company operates through its automotive segments, which includes GM North

---

[1] The GM Defendants are Mary T. Barra ("Barra"), Paul A. Jacobson ("Jacobson"), Wesley G. Bush ("Bush"), Joanne C. Crevoiserat ("Crevoiserat"), Linda R. Gooden ("Gooden"), Joseph Jimenez ("Jimenez"), Jonathan McNeill ("McNeill"), Judith A. Miscik ("Miscik"), Patricia F. Russo ("Russo"), Thomas M. Schoewe ("Schoewe"), Mark Tatum ("Tatum"), Jan E. Tighe ("Tighe"), Devin N. Wenig ("Wenig"), Aneel Bhusri ("Bhusri"), Carol M. Stephenson ("Stephenson"), Margaret C. Whitman ("Whitman"), Jane Mendillo ("Mendillo"), and Doug L. Parks ("Parks").

[2] The "Cruise Defendants" are Kyle Vogt ("Vogt"), Daniel Ammann ("Ammann"), and Wayne G. West ("West"). "Defendants" means GM, the GM Defendants, Cruise, and the Cruise Defendants together.

America ("GMNA") and GM International ("GMI") with vehicles developed, manufactured and/or marketed under the Buick, Cadillac, Chevrolet and GMC brands.

4.      Cruise is GM's "global segment" responsible for the development of autonomous vehicle ("AV") technology. Cruise purports that its goal is to develop fully autonomous driving technology for its use in a fleet of driverless robotaxis, driverless delivery services, and personal self-driving vehicles sold by GM.

5.      At all relevant times, GM owned the majority stake in Cruise.[3] According to the Company's annual report for 2024 filed on a Form 10-K with the SEC on January 28, 2025 (the "2024 10-K"), GM owned approximately 97% of Cruise.

6.      The Company acquired Cruise in 2016 to begin developing software and hardware to make fully autonomous driving technology. Thereafter, Cruise obtained testing and driving permits for its AVs based on the Company's assurances that Cruise's AV technology was capable and sufficiently safe to be tested amongst the public. For instance, according to GM's annual report for 2021 filed with the SEC on February 2, 2022, on a Form 10-K (the "2021 10-K"), in October 2020, Cruise received a driverless test permit from the California Department of Motor Vehicles ("CDMV") to remove test drivers from Cruise autonomous test vehicles in San Francisco and subsequently began fully driverless testing.

7.      Throughout the Relevant Period, Defendants repeatedly touted the capabilities of Cruise's AV technology, assuring investors and the public that the technology was safe, the technology had reached a high level of autonomy, and the AV technology had reached the point where GM and Cruise could operate a revenue-generating, fully driverless robotaxi business

---

[3] GM's ownership of Cruise is through GM Cruise Holdings LLC, which is the Company's majority-owned subsidiary. GM Cruise Holdings LLC is incorporated into references to "Cruise" herein.

3

without additional research and development. However, in reality, Cruise's AV technology was not as advanced as Defendants claimed it to be.

8.     Indeed, the truth began to emerge when, on October 2, 2023, at approximately 9:30p.m., a human-driven vehicle struck a pedestrian in San Francisco, California, while traveling in the lane immediately to the left of a Cruise AV, and launched the pedestrian into the pathway of a Cruise AV traveling in autonomous mode.[4] The Cruise AV then hit the pedestrian and came to an initial stop. However, the pedestrian was pinned beneath the Cruise AV and the car began driving again with the pedestrian underneath, dragging them approximately twenty feet and causing serious injuries (the "Crash").

9.     On the news of the Crash, the Company's stock price declined $1.09 per share, or approximately 3.4%, to close at $31.38 per share on October 3, 2023.

10.     Immediately following the Crash, high-ranking executives at Cruise and Defendants became aware of the details of the Crash and made the decision to launch a scheme to misrepresent the circumstances of the Crash to the public by disseminating incomplete and misleading video footage of the Crash and misleading statements to the media to tell the story that the Cruise AV came to a complete or immediate stop without noting that the Cruise AV subsequently resumed driving while dragging the pedestrian.

11.     Moreover, following the Crash, before the entire truth was revealed, the Defendants downplayed the severity of the Crash and continued to tout Cruise AVs as safe.

12.     Then, on October 24, 2023, the CDMV issued an order suspending Cruise's driverless permits (the "DMV Order") because the CDMV determined that "the manufacturer's

---

[4] Lena Howland et al., *Woman Injured After Being Struck by SF Hit-and-Run Driver, Trapped Under Autonomous Car*, Cruise Says, ABC (Oct. 3, 2023), https://abc7news.com/san-francisco-woman-injured-pedestrian-crash-cruise/13857047/.

vehicles are not safe for the public's operation."[5] Cruise admitted that the AV in the Crash collided with the pedestrian, stopped, and then started driving again, dragging the pedestrian for approximately twenty feet before coming to a final stop. On the same day, the California Public Utilities Commission ("CPUC") suspended Cruise's analogous driverless permit.

13.     On this news, GM's stock price declined $0.66 per share, or approximately 2.3%, to close at $28.56 per share on October 24, 2023.

14.     Two days later, on October 26, 2023, the National Highway Traffic Safety Administration ("NHTSA") released a letter the agency sent to Cruise on October 20, 2023, wherein the NHTSA revealed that it was investigating five reports of Cruise AVs engaging in inappropriately hard braking that resulted in collisions.[6] On the same day, Cruise announced that it would pause all of its AV operations across the country.[7]

15.     On this news, GM's stock price declined $1.33 per share, or approximately 4.7%, to close at $27.22 per share on October 27, 2023.

16.     Finally, on November 8, 2023, the entire truth was revealed when it was announced that Cruise issued a recall that impacted its entire fleet of 950 driverless cars across the U.S. in order to address circumstances when the software may cause the Cruise AV to attempt to pull over out of traffic instead of remaining stationary when a pullover is not the desired post-collision

---

[5] California Department of Motor Vehicles, *DMV Statement on Cruise LLC Suspension* (Oct. 24, 2023), https://www.dmv.ca.gov/portal/news-and-media/dmv-statement-on-cruise-llc-suspension/.

[6] WSAU, *US Auto Safety Agency Investigating Two New GM Cruise Crash Reports* (Oct. 26, 2023), https://wsau.com/2023/10/26/us-auto-safety-agency-investigating-two-new-gm-cruise-crash-reports/.

[7] David Shepardson, *GM Cruise Unit Suspends All Driverless Operations After California Ban*, Reuters (Oct. 27, 2023), https://www.reuters.com/business/autos-transportation/us-auto-safety-agency-investigating-two-new-gm-cruise-crash-reports-2023-10-26/.

response (the "Recall").[8]

17. On this news, GM's stock price declined $0.91 per share, or approximately 3%, to close at $26.65 on November 9, 2023.

18. Following the Relevant Period, Cruise released a report created by the law firm Quinn Emanuel Urquhart & Sullivan, LLP on January 24, 2024, after the law firm investigated the Crash (the "Quinn Report"). When it released the Quinn Report on January 25, 2024, Cruise stated that it "accepts Quinn Emanuel's conclusions." The scathing Quinn Report found that: (i) Defendant Vogt "personally wanted to see and authorize the final cut of any video or media statement" disseminated to the media; (ii) Vogt and other Cruise executives became aware the morning after the crash that the Cruise AV dragged the pedestrian after braking; and (iii) despite the Defendants' knowledge of these details, Cruise disseminated misleading video footage and statements to the public that purposefully omitted the dragging of the pedestrian and the pullover maneuver.[9]

19. As set forth herein, the GM Defendants, Cruise, and the Cruise Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, the GM Defendants, Cruise, and the Cruise Defendants failed to disclose to investors, *inter alia*, that: (i) Cruise's AV technology had not reached "Level 4" autonomy; (ii) the

---

[8] David Shepardson, *GM's Cruise Recalling 950 Driverless Cars After Pedestrian Dragged in Crash*, Reuters (Nov. 8, 2023), https://www.reuters.com/business/autos-transportation/gms-cruise-recall-950-driverless-cars-after-accident-involving-pedestrian-2023-11-08/#:~:text=WASHINGTON%2C%20Nov%208%20(Reuters),tab%20self%2Ddriving%20unit%20said.

[9] *See* Joann Muller, *Cruise "Deeply Remorseful" After Scathing Report on Robotaxi Pedestrian Incident*, Axios (Jan. 25, 2024), https://www.axios.com/2024/01/25/cruise-report-investigation.

regulatory approval of Cruise's AVs and driverless testing permits were based on GM and Cruise overstating the autonomy of the vehicles; (iii) GM and Cruise could not operate a revenue-generating, fully driverless robotaxi business without additional research and development; (iv) GM failed to maintain adequate internal controls over Cruise and the Company's public reporting; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

20.     As a result of the foregoing, the Securities Class Action was filed against GM, Cruise, and Defendants Barra, Jacobson, Vogt, Ammann, Parks, and West, in the United States District Court for the Eastern District of Michigan.

21.     As a direct and proximate result of the Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill. Moreover, the Securities Class Action has exposed the Company to massive class-wide liability.

22.     Furthermore, as detailed herein, as a direct and proximate result of the GM Defendants' misconduct, the Company repurchased its own stock at artificially inflated prices during the Relevant Period, costing GM billions of dollars.

23.     Moreover, in light of the breaches of fiduciary duty by the GM Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the GM Defendants are beholden to each other based on their longstanding business and personal relationships, the GM Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other GM Defendants on behalf of the Company.

Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC, and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

25.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

27.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the Company is headquartered in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

*Plaintiff*

29.     Plaintiff is, and has been at all relevant times, a shareholder of GM.

*Nominal Defendant*

30.     Nominal Defendant GM is a Delaware corporation with its principal executive offices located at 300 Renaissance Center, Detroit, Michigan, 48265-3000.  GM's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "GM."

*The GM Defendants*

31.     Defendant Barra has served as Chief Executive Officer ("CEO") and a director of the Company since 2014 and as Chair of the Board since 2016. Barra served in various other management positions at GM between 2008 and 2014. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Barra received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2021 | $29,136,780 |
| 2022 | $28,979,570 |
| 2023 | $27,847,405 |

32.     Defendant Jacobson has served as Executive Vice President and Chief Financial Officer ("CFO") of the Company since 2020. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Jacobson received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2021 | $9,578,648 |
| 2022 | $10,235,938 |
| 2023 | $11,123,924 |

33.     Defendant Bush has served as a director of the Company since 2019. Bush also

serves as Chair of the Company's Executive Compensation Committee and as a member of the Company's Audit Committee, Executive Committee, and Finance Committee. Defendant Bush has also served on the board of directors of Cruise since 2023. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Bush received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2021 | $335,217 |
| 2022 | $338,019 |
| 2023 | $420,572 |

34.    Defendant Crevoiserat has served as a director of the Company since 2022. Crevoiserat also serves as a member of the Company's Audit Committee, Finance Committee, and Governance and Corporate Responsibility Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Crevoiserat received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $112,150 |
| 2023 | $364,218 |

35.    Defendant Gooden has served as a director of the Company since 2015. According to the Company's 2025 annual proxy statement filed on a Schedule 14A with the SEC on April 11, 2025 (the "2025 Proxy"), Gooden will not stand for re-election in 2025. During the Relevant Period, Gooden also served as Chair of the Company's Risk and Cybersecurity Committee and as a member of the Company's Audit Committee and Executive Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Gooden received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2021 | $350,050 |
| 2022 | $323,852 |

|  | |
|---|---|
| 2023 | $378,718 |

36.     Defendant Jimenez has served as a director of the Company since 2015. Jimenez also serves as Chair of the Company's Finance Committee and as a member of the Company's Executive Compensation Committee, Executive Committee, and Risk and Cybersecurity Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Jimenez received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2021 | $374,508 |
| 2022 | $347,769 |
| 2023 | $409,279 |

37.     Defendant McNeill has served as a director of the Company since 2022. McNeill also serves as a member of the Company's Governance and Corporate Responsibility Committee and Risk and Cybersecurity Committee. Defendant McNeill has also served as Vice Chair of the board of directors of Cruise since 2023. As set forth in the Company's annual proxy statements filed with the SEC, Defendant McNeill received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2022 | $72,969 |
| 2023 | $367,347 |

38.     Defendant Miscik has served as a director of the Company since 2018. Miscik also serves as Chair of the Company's Risk and Cybersecurity Committee and as a member of the Company's Executive Committee and Finance Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Miscik received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2021 | $341,300 |
| 2022 | $296,848 |

| | |
|---|---|
| 2023 | $352,926 |

39.     Defendant Russo has served as a director of the Company since 2009. Russo also serves as independent lead director, Chair of the Company's Governance Committee, and as a member of the Company's Executive Committee, Compensation Committee, and Finance Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Russo received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2021 | $412,163 |
| 2022 | $428,752 |
| 2023 | $472,197 |

40.     Defendant Schoewe has served as a director of the Company since 2011. According to the 2025 Proxy, Schoewe will not stand for re-election in 2025. During the Relevant Period, Schoewe also served as Chair of the Company's Audit Committee and as a member of the Company's Executive Committee, Finance Committee, and Risk and Cybersecurity Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Schoewe received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2021 | $387,592 |
| 2022 | $360,269 |
| 2023 | $416,135 |

41.     Defendant Tatum has served as a director of the Company since 2021. Tatum also serves as a member of the Company's Audit Committee and Governance and Corporate Responsibility Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Tatum received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2021 | $258,256 |

| | |
|---|---|
| 2022 | $305,019 |
| 2023 | $376,619 |

42.     Defendant Tighe has served as a director of the Company since June 2023. Tighe also serves as a member of the Company's Audit Committee and Risk and Cybersecurity Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Tighe received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2023 | $195,051 |

43.     Defendant Wenig has served as a director of the Company since 2018. Wenig also serves as a member of the Company's Executive Compensation Committee. At all relevant times, Defendant Wenig has served on the board of directors of Cruise. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Wenig received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2021 | $359,050 |
| 2022 | $359,050 |
| 2023 | $400,656 |

44.     Defendant Bhusri served as a director of the Company from 2021 until 2024. During the Relevant Period, Bhusri also served as a member of the Company's Executive Compensation Committee and Governance Committee. After leaving GM in 2024, Defendant Bhusri joined the board of directors of Cruise. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Bhusri received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2021 | $72,029 |
| 2022 | $290,998 |
| 2023 | $355,635 |

45.     Defendant Stephenson served as a director of the Company from 2009 until June 2023. During the Relevant Period, Stephenson also served as Chair of the Company's Compensation Committee and as a member of the Company's Executive Committee and Governance Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Stephenson received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2021 | $352,405 |
| 2022 | $326,457 |
| 2023 | $189,060 |

46.     Defendant Whitman served as a director of the Company from 2021 until 2022. During the Relevant Period, Whitman also served as a member of the Company's Executive Compensation Committee and Governance Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Whitman received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2021 | $326,883 |

47.     Defendant Mendillo served as a director of the Company from 2016 until 2022. During the Relevant Period, Mendillo also served as a member of the Company's Audit Committee, Finance Committee, and Governance Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Mendillo received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2021 | $248,895 |
| 2022 | $2,432 |

48.     Defendant Parks served as Executive Vice President of Global Product

Development and Purchasing and Supply Chain of the Company from 2019 until December 2023. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Parks received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2021 | $8,835,477 |
| 2022 | $8,779,266 |

***The Cruise Defendants***

49.     Upon information and belief, Cruise is a Delaware corporation that maintains its principal executive offices at 333 Brannan Street, San Francisco, California 94107. GM owns a majority stake in Cruise. As of December 31, 2024, GM owned approximately 97% of Cruise.

50.     Defendant Vogt is the founder of Cruise, served as President and Chief Technology Officer ("CTO") of Cruise during the Relevant Period, and has served as CEO of Cruise since December 2021.

51.     Defendant Ammann served as CEO of Cruise from January 2019 until December 2021. Prior to the Relevant Period, Ammann served in various roles at GM, including as President of GM from 2014 until 2019, and as Senior Vice President and CFO from 2011 until 2013.

52.     Defendant West served as Chief Operating Officer of Cruise during the Relevant Period.

## <u>FIDUCIARY DUTIES OF THE GM DEFENDANTS</u>

53.     By reason of their positions as officers and/or directors of GM, and because of their ability to control the business and corporate affairs of GM, the GM Defendants owed GM and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage GM in a fair, just, honest, and equitable manner.  The GM Defendants were and are required to act in furtherance of the best interests of

GM and its shareholders.

54.     Each director and officer of the Company owes to GM and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

55.     The GM Defendants, because of their positions of control and authority as directors and/or officers of GM, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

56.     To discharge their duties, the officers and directors of GM were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

57.     Each GM Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the GM Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of GM, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the GM Defendants were aware or should have been aware posed a risk of serious injury to the Company.

58.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the GM Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future

business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

59.    Additionally, by virtue of the fact that GM owned and controlled Cruise at all relevant times, the GM Defendants owed fiduciary duties to the Company's shareholders to oversee Cruise and its management, internal controls, and public statements, including the dissemination of false and/or materially misleading information regarding GM's and Cruise's business, prospects, and operations, including the Crash, and had a duty to cause GM to disclose in its filings with the SEC all of the facts described in this Complaint regarding Cruise and the Crash that the Company failed to disclose.

60.    To discharge their duties, the officers and directors of GM were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company and Cruise.  By virtue of such duties, the officers and directors of GM were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to GM's own Code of Conduct (the "Code of Conduct");

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how GM conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Oversee the operations of Cruise and take steps to correct any wrongful, illegal, or misleading conduct;

(v)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of GM and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(vi)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that GM's operations would comply with all applicable laws and GM's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vii)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees, including statements made by Cruise and its employees, and any other reports or information that the Company was required by law to disseminate;

(viii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(ix)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and its subsidiaries and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

61. Each of the GM Defendants further owed to GM and the shareholders the duty of loyalty requiring that each favor GM's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

62. At all times relevant hereto, the GM Defendants were the agents of each other and of GM and were at all times acting within the course and scope of such agency.

63. Because of their advisory, executive, managerial, and directorial positions with GM, each of the GM Defendants had access to adverse, non-public information about the Company.

64. The GM Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by GM.

## GM'S CODE OF CONDUCT

65. GM's Code of Conduct begins with a message from Defendant Barra, which states, in relevant part, "We are committed to our core values: customers, relationships, and excellence. We must always act with integrity, take accountability for results, and do the right thing, even when the right thing is hard to do. Quality and safety – both customer and workplace – are foundational commitments, never compromised."

66. The Code of Conduct states that it applies to "everyone in [the] [C]ompany, including employees, supervisors, board members, and subsidiaries GM controls." The Code of Conduct further states that "[w]e expect our third parties, including suppliers, to act in a way that is consistent with the principles and values of our Code when conducting business with GM. We expect employees working with our third parties to hold them accountable."

67. In a section titled "Safety," the Code of Conduct states, in pertinent part:

> We all want a safe and healthy workplace, just like our customers want safe, high-quality vehicles. We consider safety to be the driving force behind everything we do as a company. Quality and safety are foundational commitments, never compromised.

> VEHICLE SAFETY

> Everyone at GM has a personal responsibility for vehicle safety. We are each expected to maintain the highest standards and to put the safety of our customers first – without exception.

> As a company, we strive to always produce the safest vehicles for our customers and understand that to do so, we must maintain an active dialogue about safety. Do your part by identifying, reporting, and escalating safety issues that you learn of or suspect so that we can strengthen our approach to vehicle safety.

68.    In a section titled "Conflicts of Interest," the Code of Conduct states, in relevant

part, that:

> We're loyal and always act in the best interest of our company and our customers. We avoid conflicts of interest and never use our position or company assets for personal gain. . . .

> AVOIDING CONFLICTS

> A conflict of interest arises when our personal interests interfere with your GM job or ability to make objective decisions on behalf of our company. We work to avoid even the appearance of a conflict.

> Although our Code does not list every situation that can present a conflict, there are a few instances where conflicts typically arise:

> **Personal relationships** – Supervising a friend, family member, or someone with whom you have a romantic relationship.

> **Outside activities** – Allowing a second job or service to another organization to take away the loyalty, time, energy, or talent you bring to your position or present a conflict with your GM responsibilities.

> **Financial interests** – Investing in a company that does business with or competes with GM.

> **Business opportunities** – Taking an opportunity you learned about through your work at GM for yourself or starting a business that competes with our company.

**Family members** – Allowing a member of your family to receive improper personal benefits as a result of your position with our company.

69.     In a section titled "Accurate Recordkeeping and Financial Reporting," GM's Code

of Conduct states that:

We maintain books and records that accurately reflect our business and financial situation. All of us have a responsibility to record transactions honestly and handle our records with care.

ACCURATE RECORDKEEPING

We protect the integrity of our records. Our company may face serious penalties or consequences if we don't keep accurate records of financial transactions and company information. If you're responsible for preparing public financial disclosures, make sure that the information we report is clear, complete, and timely. Watch for and **report** signs of potential fraud, bribery, or money laundering activity.

RECORDS MANAGEMENT

We manage our records properly and retain the records we need to support our tax, financial, and legal obligations. Always follow our records retention policies and securely dispose of records that are no longer needed. Remember to never dispose of any information that may be relevant to an investigation or subject to a litigation hold.

## **GM'S BOARD OF DIRECTORS CORPORATE GOVERNANCE GUIDELINES**

70.     The Board also maintains separate Corporate Governance Guidelines to "promote

the effective functioning of the Board and its committees and to set forth a common set of

expectations as to how the Board should perform its functions."

71.     Under the section titled "Role of the Board of Directors," the Corporate Governance

Guidelines state:

The Board is elected by the shareholders to oversee their interest in the long-term sustainable health and the overall success of the business and its financial strength. The Board serves as the ultimate decision making body of the Company, except for those matters reserved to or shared with the shareholders. The Board selects and oversees the members of senior management, who are charged by the Board with conducting the business of the Company.

21

The core responsibility of the directors is to exercise their business judgment to act in what they reasonably believe to be in the best interests of the Company and its shareholders. Directors must fulfill their responsibilities consistent with their fiduciary duties to the shareholders, in compliance with all applicable laws and regulations. The Board oversees management's activities in connection with proper safeguarding of the assets of the Company, maintenance of appropriate financial and other internal controls, and compliance with applicable laws and regulations and proper governance.

72.    In the section titled "Management Oversight," the Corporate Governance Guidelines state:

The business of GM is conducted by management under the oversight of the Board. The roles of the Board and management are related, but distinct. GM's business strategy is developed and implemented under the leadership and direction of the Chief Executive Officer (the "CEO") by its officers and other employees. The members of the Board act as advisers and counselors to the CEO and senior management.  In performing its general oversight function, the Board reviews and assesses GM's strategic and business planning as well as management's approach to addressing significant risks and challenges facing the Company that relate to strategic, operational, financial, legal and compliance, as well as sustainability.

73.    With respect to "Risk Oversight," the Corporate Governance Guidelines state:

The Board, through its Risk and Cybersecurity Committee, oversees risk management at the Company. The Board and its committee assess whether management has an appropriate framework to manage risks and whether that framework is operating effectively. As part of this function, the Board reviews and discusses reports regularly submitted and engages with management on risk as part of broad strategic and operational discussions.

74.    Under the section titled "Ethics and Conflicts of Interest," the Corporate Governance Guidelines state:

The Board is committed to upholding the highest legal and ethical conduct in fulfilling its responsibilities. The Board expects all directors, as well as officers and employees, to act ethically at all times and to adhere to the policies set forth in "Winning With Integrity: Our Values and Guidelines for Employee Conduct" (available on the Internet at www.gm.com/investor, under "Corporate Governance). The Board will not permit any waiver of any ethics policy for any director or executive officer. If an actual or potential conflict of interest arises for a director, the director will promptly inform the Chair of the Board, Lead Director or Chair of the Governance Committee. If a significant conflict exists and cannot be

resolved, the director should resign. All directors must recuse themselves from any discussion or decision affecting their business or personal interests.

## GM'S AUDIT COMMITTEE CHARTER

75.    GM's Audit Committee Charter states that the purpose of the Audit Committee is to "assist the Board in its oversight of the quality and integrity of GM's financial statements, GM's compliance with legal and regulatory requirements, the qualifications, performance and independence of the external auditors and the performance of GM's internal audit staff." The "Purpose" section of the Audit Committee Charter further states that:

> The Committee shall (among other responsibilities and duties specified in this Charter):

- independently and objectively monitor the effectiveness of GM's financial reporting process and systems of disclosure controls and internal controls;

- select and engage GM's external auditors and review and evaluate the external auditors' audit process;

- review and evaluate the scope and performance of the internal audit function;

- provide for open, ongoing communications regarding GM's financial position and affairs between the Board and the external auditors, GM's financial and senior management, and GM's internal audit staff;

- review GM's policies and compliance procedures regarding ethics and legal risk;

- oversee the preparation of the Audit Committee Report for the annual proxy statement; and

- provide periodic status reports to the Board.

76.    In a section titled "Financial Statements," the Audit Committee Charter states that the Audit Committee has the following responsibilities and duties:

- Discuss with management and the external auditors the annual audited financial statements and quarterly financial statements prior to filing. This will include a discussion of Management's Discussion and Analysis of

Financial Condition and Results of Operations and GM's earnings announcements, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies, and the results of the external auditors' reviews. These discussions may be general, covering the type of information to be disclosed and presentation to be made, and need not take place in advance. The Committee may be represented by the Committee Chair or a subcommittee to review earnings announcements.

- Periodically and in connection with the review of annual audited financial statements and quarterly financial statements:

  o Review critical accounting policies, financial reporting and accounting standards and principles (including significant changes to these principles or application), and key accounting decisions and judgments affecting GM's financial statements. The review shall include the rationale for such choices and other GAAP treatments considered by management, if appropriate;

  o Review the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements;

  o Review with the external auditors any alternative accounting treatment or fraud or illegal acts that the external auditors discussed with management, disagreements with management, difficulties encountered in performing its review or audit, or any issues with management's response to any of the foregoing;

  o Review GM's financial reporting process, including disclosure controls and procedures, the systems of internal control, and the external auditors' attestation of management's internal control report;

  o Discuss with the external auditors matters required to be discussed by the Public Company Accounting Oversight Board Statement on Auditing Standards No.1301 regarding the conduct of the audit; and

  o Review any disclosure of material weaknesses or significant deficiencies in the design or operation of internal controls and any additional audit procedures performed as a result of such weaknesses or deficiencies.

- Review and approve as necessary:

  o Any commitment to an exit or disposal plan or other disposition of a long-lived asset or termination of employees under a plan of

termination described in FASB Accounting Standards Codification420-10-25-4, under which GM will incur material charges;

o Any determination or conclusion by management that a material charge to one or more of GM's assets, including impairments of securities or goodwill, is required; and

o Any determination or conclusion by management that any previously issued annual or quarterly financial statements should no longer be relied upon because of a material misstatement or omission.

- In the event of any material restatement or material reclassification resulting from a material error to GM's audited consolidated financial statements, make appropriate inquiry into management's judgment about the cause to determine if any other action should be taken and if additional internal controls should be implemented to prevent recurrences in the future.

- Recommend to the Board whether the audited financial statements should be included in the Annual Report on Form 10-K.

77. In a section titled "Non-Financial Reporting: Sustainability, Environmental, Social, and Governance ('ESG'), and Integrated Reporting," the Audit Committee Charter states that the Audit Committee has the following responsibilities and duties:

- At least annually, review legislative and regulatory developments, including changes affecting ESG and climate risk disclosures within the financial reporting framework.

- Monitor developments in integrated reporting for these areas for alignment with financial reporting, including discussions with management and the external auditor regarding the Company's reporting and disclosure with respect to ESG matters made pursuant to sustainability reporting frameworks (e.g., the Value Reporting Foundation, Task Force on Climate-Related Financial Disclosures, Global Reporting Initiative, etc.) and any assurance being provided by the external auditor with respect to such reporting and disclosure.

- At least annually, review reports by management regarding internal quality control procedures over ESG disclosures.

- Annually review for approval, in consultation with the Governance and Corporate Responsibility Committee, the Sustainability Report.

78.    In a section titled "Legal, Compliance, and Risk Management," the Audit Committee Charter states that the Audit Committee has the following responsibilities and duties:

- Oversee the establishment and maintenance of procedures for the receipt, retention, and treatment of complaints or concerns received by GM regarding accounting, internal accounting controls, or auditing matters, including enabling employees to submit concerns confidentially and anonymously.

- Review management's disclosure of any fraud that involves management or other employees who have a significant role in internal control.

- At least annually, review procedures and compliance processes regarding corporate ethics and standards of business conduct as embodied in GM's code of conduct, Winning With Integrity, and approve any significant revisions.

- Provide oversight for legal, regulatory and compliance programs. The General Counsel and the Chief Compliance Officer shall report, and have direct access, to the Audit Committee on legal, regulatory and compliance matters.

- Review management's assessment of legal and regulatory risks identified in GM's compliance programs.

- At least annually, and more frequently as necessary, meet in private session with the General Counsel.

- Annually review and approve the Global Ethics and Compliance Center budget, staffing, allocation of resources, and annual plan of activities and when material changes, its Charter.

- At least annually, and more frequently as necessary, meet in private session with the Chief Compliance Officer.

- Receive notification before the Chief Compliance Officer is terminated, or the Chief Compliance Officer's compensation or scope of their duties are significantly diminished.

- As the Qualified Legal Compliance Committee (QLCC), review and discuss any reports received from attorneys regarding securities law violations and/or breaches of fiduciary duties which were reported to the General Counsel or the Chief Executive Officer and not resolved to the satisfaction of the reporting attorney.

26

- Discuss policies regarding risk assessment and risk management, which should include discussion of GM's major financial and accounting risk exposures and actions taken to mitigate these risks.

## SUBSTANTIVE ALLEGATIONS

### The Company's Background

79.     Incorporated in 2009, GM designs, builds, and sells trucks, crossovers, cars, and automobile parts and provides software-enabled services and subscriptions worldwide.

80.     The Company operates through its automotive segments, which includes GMNA and GMI with vehicles developed, manufactured and/or marketed under the Buick, Cadillac, Chevrolet and GMC brands.

81.     In its public filings, the Company purports that Cruise is its "global segment responsible for the development and commercialization of AV technology."

82.     Throughout the Relevant Period, GM owned the majority of Cruise. According to the 2024 10-K, GM owned approximately 97% of Cruise as of December 31, 2024.

83.     In GM's financial reporting in its quarterly and annual reports with the SEC, the Company reports sales, revenue, losses, investments, liquidity, and more for Cruise.

### Cruise and Cruise's AV Technology

84.     Cruise, formerly known as Cruise Automation, Inc., was founded in 2013 with the initial goal to build a retrofit kit that would allow cars to drive on highways with high-level autonomy. In 2015, Cruise decided to pivot towards "fully driverless technology."

85.     In March 2016, GM acquired a majority stake in Cruise to "further accelerate

[GM's] development of autonomous vehicles."[10] Then-President of GM, Defendant Ammann, touted the acquisition, stating "[f]ully autonomous vehicles can bring our customers enormous benefits in terms of greater convenience, lower cost and improved safety for their daily mobility needs."

86.     After GM's acquisition of Cruise in 2016, Cruise utilized GM's all-electric Chevrolet Bolt vehicles, sometimes referred to as "AV-Bolts," which are retrofitted with Cruise AV technology.

87.     In 2018, GM invested an additional $1.1 billion in Cruise and began describing Cruise in its public filings as the Company's "global segment responsible for the development and commercialization of [AV] technology." Similarly, GM advised the market that "[a]s a result of the growing importance of our autonomous vehicle operations, we moved these operations from Corporate to GM Cruise and began presenting GM Cruise as a new reportable segment in the three months ended June 30, 2018."

88.     In 2020, GM unveiled the Cruise Origin, which is an all-electric self-driving vehicle developed by GM, Cruise, and Honda Motor Company, Ltd.[11] In the 2021 10-K, GM stated that building of the Cruise Origin would begin in early 2023 pending government approvals. GM touted the Origin as being integral for the Company's success in the AV business. For instance, on February 24, 2021, Defendant Barra participated in a conference hosted by Wolfe Research Global Auto, Auto Tech, and Mobility Conference on behalf of GM, wherein she described the Origin as

---

[10] General Motors Company, *GM to Acquire Cruise Automation to Accelerate Autonomous Vehicle Development* (Mar. 11, 2016), https://investor.gm.com/news-releases/news-release-details/gm-acquire-cruise-automation-accelerate-autonomous-vehicle.

[11] Michael Wayland & Lora Kolodny, *GM Unveils Cruise Origin Driverless Shuttle*, CNBC (Jan. 21, 2020), https://www.cnbc.com/2020/01/21/gm-subsidiary-cruise-unveils-its-first-purpose-built-autonomous-vehicle.html.

one of the "pieces that [is] necessary to have a successful ride-sharing business, autonomous ride-sharing business."

89.     According to the 2021 10-K, in October 2020, Cruise received a driverless test permit from the CDMV to remove test drivers from Cruise autonomous test vehicles in San Francisco and subsequently began fully driverless testing. Moreover, the 2021 10-K stated that in June 2021, Cruise received a driverless test permit from the CPUC to provide unpaid rides to the public in driverless vehicles, and in September 2021, Cruise received approval of its Autonomous Vehicle Deployment Permit from the CDMV to commercially deploy driverless AVs.

90.     Prior to the start of the Relevant Period, on February 10, 2021, during the Company's earnings call hosted for investors and analysts to discuss its first quarter 2021 financial results (the "1Q21 Earnings Call"), Defendant Jacobson touted the Company's commitment to Cruise, stating that GM planned to spend $1 billion on AV development in 2021. During the 1Q21 Earnings Call, Defendant Barra also stated that Cruise planned to develop and operate a fleet of robotaxis in San Francisco and then expand, stating:

> [O]nce we have launched in one city, [there will be] the opportunity to go to the next and do the work to make sure the technology is adaptable to the unique things of another city. So, I think once we launch successfully and demonstrate that the technology is safer than a human driver and we demonstrate to customers, I think that we can really increase the number of cities that we're offering it quite quickly, and that's what we'll focus on doing.

91.     Throughout the Relevant Period, the Company, Cruise, and their top executives repeatedly touted the capabilities of Cruise's AV technology, assuring investors and the public that the technology was safe. Specifically, the Defendants assured investors that Cruise's AV vehicles could drive safely, reliably, and legally without input from humans and that the AV technology had reached the point where GM and Cruise could operate a revenue-generating, fully driverless robotaxi business without additional research and development.

92.     One term the Defendants used to refer to Cruise's AV technology throughout the Relevant Period was "Level 4" (or "L4") autonomy. Level 4 autonomy is a part of the five levels of autonomy defined by the Society for Automotive Engineers ("SAE"). According to the SAE, for a vehicle to be classified with Level 4 autonomy, the vehicle must be able to drive 100% of the time without human input.[12]

93.     However, as detailed herein, despite the Defendants statements to the public, Cruise's AV technology was not as advanced and safe as Defendants claimed it to be. Indeed, as would later be revealed, Cruise's AV technology had not reached Level 4 autonomy because it: (i) was highly dependent on remote operators who intervened every 2.5 to 5 miles; (ii) faced an enormous number of safety issues, many of which were logged and unresolved; (iii) struggled with basic requirements of safe driving; and (d) routinely stopped in traffic or became dangerously stranded.

***The Materially False and Misleading Statements***

94.     On April 30, 2021, the Company filed its annual proxy statement for 2021 on a Schedule 14A with the SEC (the "2021 Proxy"). The 2021 Proxy assured investors that the Board and its committees had proper risk oversight mechanisms in place, stating, in relevant part:

Role of the Board of Directors

The Board of Directors has overall responsibility for risk oversight and focuses on the most significant risks facing the Company. The Board discharges its risk oversight responsibilities, in part, through delegation to its Committees. The Company's risk governance is facilitated through a top-down and bottom-up communication structure, with the tone established at the top by Ms. Barra, our Chairman and CEO, who is also our Chief Risk Officer, and other members of management, specifically the Senior Leadership Team. The Senior Leadership Team also utilizes our Risk Advisory Council, an executive-level body with delegates from each business unit and function, to discuss and monitor the most

_____

[12] *See* Society for Automotive Engineers, *SAE Levels of Driving Automation Refined for Clarity and International Audience* (May 3, 2021), https://www.sae.org/blog/sae-j3016-update.

significant enterprise risks in a cross-functional setting. They are tasked with championing risk management practices and integrating them into their functional or regional business units.

Role of the Board Committees

Each of the Board's Committees has a critical role to play in the overall execution of the Board's risk oversight duties. The Board delegates oversight for certain risks to each Committee based on the risk categories relevant to the subject matter of the Committee. The Chair of the Risk and Cybersecurity Committee coordinates with the Chairs of the other Committees to support them in managing the relationship between risk management policies and practices and their respective oversight responsibilities. The Risk and Cybersecurity Committee also assists the Board by monitoring the overall effectiveness of the Company's risk management framework and processes. Below is a summary of the key risk oversight responsibilities that the Board has delegated to the Committees.

95.     In a section titled "Corporate Governance," the 2021 Proxy also touted the Board's

role in ensuring the Company maintained proper internal controls, among other things, stating:

GM is governed by a Board of Directors and Committees of the Board that meet throughout the year. The Board is elected by shareholders to oversee and provide guidance on the Company's business and affairs. It is the ultimate decision-making body of the Company except for those matters reserved for shareholders by law or pursuant to the Company's governance instruments. Among other things, the Board oversees Company strategy and execution of the strategic plan. In addition, it oversees management's proper safeguarding of the assets of the Company, maintenance of appropriate financial and other internal controls, compliance with applicable laws and regulations, and proper governance. The Board is committed to sound corporate governance policies and practices that are designed and routinely assessed to enable the Company to operate its business responsibly, with integrity, and to position GM to compete more effectively, sustain its success, and build long-term shareholder value.

96.     Under a section titled "Our Company Performance," the 2021 Proxy stated that "In

2020, General Motors met the challenges presented by COVID-19 while working towards our

vision of a world with zero crashes, zero emissions, and zero congestion. ***The results below***

***demonstrate our commitment to safety for our employees and our customers***, and highlight GM's

accelerated strategy to deliver an all-electric future powered by the strength of our core business."

(Emphasis added). This same section listed the following as "key highlights" of 2020, among

31

others:

> Announced Microsoft will join GM, Honda, and institutional investors to accelerate the commercialization of self-driving, shared, all-electric vehicles in a combined new equity investment of more than $2 billion in Cruise, bringing the post-money valuation of Cruise to $30 billion[.]

> Received a permit from the California Department of Motor Vehicles to operate without anyone behind the wheel. Unveiled the Cruise Origin, a self-driving EV developed for a million miles of 24-hour EV service.

97.    The 2021 Proxy also contained a section on the Company's Code of Conduct, which stated, in relevant part:

> The Board is committed to the highest legal and ethical standards in fulfilling its responsibilities. We have adopted a code of business conduct and ethics, "Winning with Integrity," that applies to our directors and employees, including the Company's executive officers. This Code of Conduct forms the foundation for compliance with corporate policies and procedures and creates a Company-wide focus on uncompromising integrity in every aspect of our operations. It embodies our expectations for a number of topics, including workplace and vehicle safety, conflicts of interest, protection of confidential information, insider trading, competition and fair dealing, human rights, community involvement and corporate citizenship, political activities and lobbying,

> preservation and use of Company assets, and compliance with all laws and regulations applicable to the conduct of our business. Employees are expected to report any conduct that they believe in good faith to be an actual or apparent violation of our Code of Conduct. The Code of Conduct is available at investor.gm.com/resources.

98.    On June 3, 2021, Defendant Barra attended a conference hosted by Credit Suisse on behalf of the Company, wherein she highlighted Cruise's progress with AV testing, stating:

> And they're really shifting from just the R&D to the whole – what will it take from a commercialization perspective. ***They recently received their approval to test in San Francisco without a backup driver and they filed an application with the California DMV to deploy the self-driving vehicles in San Francisco with no driver behind the wheel***. And this is a significant accomplishment which is really getting us much closer to literally being on the streets of San Francisco.

(Emphasis added).

99.    On June 14, 2021, at GM's Annual Meeting of Shareholders, Defendant Barra again

32

touted Cruise's AV technology and highlighted the recent CPUC permit, stating:

> Cruise's real-word driverless vehicle testing in San Francisco and its last mile delivery pilot with Walmart in Arizona are paving the way for new commitments, like the one Cruise recently signed with the City of Dubai for up to 4,000 automated taxis. And just recently, the California Public Utilities Commission issued Cruise a permit to give passengers a ride without a driver behind the wheel. It's the first permit of its kind and another significant validation of Cruise's approach to AVs.

100.    On October 6, 2021, GM held its Investor Day (the "October 6th Investor Day"), wherein Defendant Barra stated:

> We're creating software enabled services including the development of Ultifi. And we're extending our lead in automated driver assistance with Ultra Cruise and further commercializing Super Cruise. ***And with Cruise, we are defining the commercialization strategies for Level 4 autonomy.*** We're launching businesses that will bring new customers and new revenues to GM. And thanks to GM Manufacturing, we're able to do this at scale with speed, agility and quality. I said it earlier but it's worth repeating, we have changed the world before and we're doing it again.

(Emphasis added).

101.    Defendant Parks also touted Cruise's "Level 4" autonomy during the October 6th Investor Day, stating, "Now Cruise, as [Ammann] just discussed, is developing and ***launching a driverless fully autonomous Level 4 vehicle***. This is how we plan to be first to market and win in rideshare, autonomous delivery and other AV services." (Emphasis added).

102.    During the same October 6th Investor Day, executives of Cruise, including Defendant Ammann, made numerous statements to investors regarding the progression of Cruise AV's technology and the development of a fully driverless AV system, including emphasizing that the AV technology was Level 4 and assuring investors that they were in the commercialization phase. For instance, Defendant Ammann assured GM's investors that the Company was on track for commercialization, stating:

> So where are we on the Cruise journey? We think about the journey as having three main phases to it. Over the last several years from 2015, 2016 timeframe through

the end of last year, we were clearly very much in an R&D phase. This was all about building up the core technology and trying to solve that engineering challenge of a generation of building a self-driving system that can drive with a human or better level of performance. And we first reached that threshold for the first time late last year. And that's what allowed us to begin fully driverless testing on the streets of San Francisco which we began around October, November of last year. And that marked the beginning of the next phase of the Cruise journey which we refer to as early commercialization.

103.     Defendant Ammann also stated, "So where are we right now? So we're in the middle of this early commercialization phase. In San Francisco, we're doing driverless testing as you know and we're about very soon going to move from that into offering rides to passengers, fully driverless rides to passengers."

104.     Additionally, during the October 6th Investor Day, Defendant Ammann touted the AV technology, conveying to investors that the technology was at a high enough performance level where it could "take the human out of the loop." Specifically, Ammann stated:

> ***And so what we did then was to work really hard on driving the level of performance up, that 1000x improvement that you saw, to get to the point where we can take the human out of the loop***. And unsurprisingly along the way of driving up that performance, we discovered a lot of unknown unknowns, unanticipated problems, things we hadn't thought would happen along the way and ***that's why we felt it was so important to solve that part of the equation first to get to the point where we know we can take the human out of the loop and do that safely. And then we can start to optimize on things like operating domain and taking costs down and so on*** . . . .
>
> ***So we have a system that can operate without a human in the loop now.*** It is more expensive. And so the question becomes how do you deploy that into a business successfully and profitably and grow a business off of that? And this is where the partnership between Cruise and GM becomes incredibly important. So as most of you know today, we're operating a fleet of Bolt EVs based off the Chevy Bolt platform. That's our development fleet. And that's also the vehicle fleet that we will initially commercialize with through this early commercialization period here. And so having that vehicle purpose built or purpose upgraded to support our AV system by GM and built in a factory and that level of reliability has been a huge advantage for us from a development point of view. But that's really just the beginning.

(Emphasis added).

105.    On October 27, 2021, GM hosted an earnings call for investors and analysts to discuss the Company's financial results for the third quarter of 2021 (the "3Q21 Earnings Call"), wherein Defendant Barra touted Cruise AVs purported "Level 4" autonomy, stating, in relevant part:

> After spending time with our leaders and subject matter experts, I hope it's clear to you that we have assembled the right technology to have the right platforms, and we have the right talent to achieve our long-term goals, including doubling our annual revenue and expanding our margins. Our confidence comes from the fact that we are already making significant progress in transforming GM from a traditional automaker to really a platform innovator. You can see it in . . . the rapid expansion of Super Cruise, the development of level two plus autonomy with Ultra Cruise, [and] the lead cruise has in level four autonomous driving.

106.    Also during the 3Q21 Earnings Call, Defendant Barra told investors that Cruise was on the "cusp" of commercialization, stating,

> As cruise CEO Dan Ammann said, the complementary skills of GM and cruise have brought it to the cusp of commercialization. This includes the launch of the Cruise Origin that will be produced at Factory Zero, and we have already built dozens of engineering development vehicles like the ones you saw during investor day.

107.    In response to a question regarding the commercial milestones for Cruise during the 3Q21 Earnings Call, Defendant Barra stated, in relevant part:

> So *we're executing aggressively to commercialization*, and we have the ability to do that with the steps that we've already taken, as well as with GM's involvement. And I think what you need to really look at though with cruise is the vertical integration with GM is a key differentiator, and I believe it's one of the reasons cruise is so well positioned as the only person who's got the permit in South -- in San Francisco to actually take the driver out of the vehicle. That seamless integration of the technology along with leveraging Ultium, as well as our manufacturing capability are a huge value.

> So I think the message on cruise is we're well-funded and *we have rapid commercialization plans in front of us*, and that's the play we're executing.

(Emphasis added).

108.    On February 1, 2022, the Company hosted an earnings call for investors and

analysts to discuss GM's financial results for the fourth quarter of 2022 (the "4Q22 Earnings Call"). During the 4Q22 Earnings Call, Defendant Vogt assured investors that Cruise was on track with its testing, stating:

> On the permit, we still have five out of the six necessary permits to operate a fared rideshare service. So, as of today, all of the rides are free. And we filed the last – the application for the last remaining permit in November last year, and we continue to work with the CPUC, California Public Utilities Commission, and answer questions they have about that application as they pop up. So, stay tuned for more news on that.

109.   On February 2, 2022, the Company filed the 2021 10-K. As referenced above, the 2021 10-K highlighted the permits Cruise had received for driverless testing, stating:

> In October 2020, Cruise received a driverless test permit from the California Department of Motor Vehicles to remove test drivers from Cruise autonomous test vehicles in San Francisco and subsequently began fully driverless testing. In October 2020, GM and Cruise also announced they will file an exemption petition with the National Highway Traffic Safety Administration (NHTSA) seeking regulatory approval for the Origin's deployment, and withdrew an earlier exemption petition that was limited to the Cruise AV derived from the Chevrolet Bolt platform.
>
> In June 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles. In September 2021, Cruise received approval of its Autonomous Vehicle Deployment Permit from the California Department of Motor Vehicles to commercially deploy driverless AVs.

110.   The 2021 10-K also stated:

> **Overview** Our vision for the future is a world with zero crashes, zero emissions and zero congestion, which guides our growth-focused strategy to invest in EVs and AVs, software-enabled services and subscriptions and new business opportunities, while strengthening our market position in profitable ICE vehicles, such as trucks and SUVs. We will execute our strategy with a diverse team and a steadfast commitment to good citizenship through sustainable operations and a leading health and safety culture. . . .
>
> *Cruise* Cruise is actively testing AVs in the United States. Gated by safety and regulation, the goal of Cruise is to deliver its self-driving services as soon as possible.

36

111.     The 2021 10-K was signed by Defendants Barra, Jacobson, Russo, Bhusri, Bush, Gooden, Jimenez, Mendillo, Miscik, Schoewe, Stephenson, Tatum, Wenig, and Whitman. The 2021 10-K was also accompanied by certifications made by Defendants Barra and Jacobson pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (the "SOX Certifications"), wherein Defendants Barra and Jacobson attested to the accuracy of the 2021 10-K.

112.     On March 10, 2022, Defendant Vogt attended a conference hosted by Morgan Stanley wherein he touted the commercialization of Cruise AVs, stating:

> What I would say and what I've said in the past is that given the amount of work it takes to take the driver out of the car and put a vehicle on a public road, especially in a major city, that's a proof point. That's an existence proof. This technology has reached a certain level of maturity.
>
> And I think that really is a line you can draw in the sand between companies who have reached that milestone and have the conviction behind the quality and safety of their technology to deploy it, and those that are somewhere still in the R&D phase.

113.     During the same Morgan Stanley conference, Defendant Vogt stated that the Cruise AVs were at Level 4 autonomy, stating:

> Well, that, I don't know. That I don't know. I think a lot of people do like driving some of the time. And there are certain use cases where ***our vehicles are level four***. We don't need as much point in level five vehicles because you don't necessarily need a vehicle that can drive on an ice highway in Alaska or something.

(Emphasis added).

114.     On April 26, 2022, Defendant Barra published a letter to GM's shareholders, which stated, in part:

> I will close this letter by recognizing the progress of the incredible team at Cruise. In January, Cruise became the first company to begin offering fully driverless rides in a congested urban environment. That is San Francisco, with all its complexities.

115.     On April 27, 2022, the Company filed a quarterly report for the period ended March 31, 2022 on a Form 10-Q with the SEC (the "1Q22 10-Q"). The 1Q22 10-Q stated:

37

In 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles and received approval of its Autonomous Vehicle Deployment Permit from the California Department of Motor Vehicles to commercially deploy driverless AVs. Cruise will need one additional permit from the CPUC to charge the public for driverless rides in California.

116.   The 1Q22 10-Q was accompanied by SOX Certifications made by Defendants Barra and Jacobson, wherein they attested to the accuracy of the 1Q22 10-Q.

117.   On April 28, 2022, the Company published its 2021 Sustainability Report, which again highlighted Cruise's progression on a driverless fleet, stating:

In October 2020, Cruise became one of the first California companies permitted by the California Department of Motor Vehicles to test AVs without a trained test driver in the vehicle, and the first company to do so in the complex driving environment of San Francisco.

In June 2021, Cruise became the first company to receive a permit from the California Public Utilities Commission (CPUC) to provide passenger test rides in its AVs without a trained test driver in the vehicle. As the first company to receive such a permit, Cruise has been conducting fully driverless rides with the public—completing hundreds of such test rides by the end of 2021.

Pending final approval from the CPUC, Cruise is one permit away from being able to commercialize its fully autonomous ride-hail business within its operational design domain in San Francisco. Cruise remains on track to begin charging for fully driverless ride-hail operations in the coming months.

Cruise is also continuing to expand its collaboration with Walmart, which invested in Cruise in 2021. Last year, Cruise and Walmart launched a fully autonomous commercial delivery service in Scottsdale, Arizona, with more than 3,000 deliveries completed by the end of 2021. Walmart customers in the area are now able to opt-in to autonomous delivery services and track their order through the Cruise web app.

118.   On April 29, 2022, the Company filed its annual proxy statement for 2022 on a Schedule 14A with the SEC (the "2022 Proxy"). The 2022 Proxy began with a letter to shareholders from Defendant Barra, wherein she touted the driverless Cruise vehicles, stating, in relevant part:

Earlier this year, we named Kyle Vogt as the CEO of Cruise. Under his leadership, driverless Cruise test vehicles are rapidly accumulating miles and transporting members of the public throughout San Francisco, and Cruise is one permit away from being able to provide paid ride-hailing services there. ***We also recently increased our stake in Cruise, which gives us even more flexibility to create value for shareholders as we advance our integrated strategy to commercialize and unlock the full potential of AV technology***.

(Emphasis added).

119.    Additionally, the 2022 Proxy contained similar statements to the 2021 Proxy on the

Company's risk oversight mechanisms, stating, in relevant part:

Role of the Board of Directors

The Board has overall responsibility for risk oversight and focuses on the most significant risks facing the Company. The Board discharges its risk oversight responsibilities, in part, through delegation to its Committees. The Company's risk governance is facilitated through a top-down and bottom-up communication structure, with the tone established at the top by Ms. Barra, our Board Chair and CEO, who is also our Chief Risk Officer, and other members of management, specifically the Senior Leadership Team. The Senior Leadership Team also utilizes our Risk Advisory Council, an executive-level body with delegates from each business unit, to discuss and monitor the most significant enterprise and emerging risks in a cross-functional setting. They are tasked with championing risk management practices and integrating them into their functional or regional business units.

Role of the Board Committees

Each of the Board's Committees has a critical role to play in the overall execution of the Board's risk oversight duties. The Board delegates oversight for certain risks to each Committee based on the risk categories relevant to the subject matter of the Committee. The Chair of the Risk and Cybersecurity Committee coordinates with the Chairs of the other Committees to support them in managing the relationship between risk management policies and practices and their respective oversight responsibilities. The Risk and Cybersecurity Committee also assists the Board by monitoring the overall effectiveness of the Company's risk management framework and processes. For example, GM's Strategic Risk Management team conducts an annual risk assessment, which the Risk and Cybersecurity Committee reviews and receives detailed management updates regularly throughout the year.

Below is a summary of the key risk oversight responsibilities that the Board has delegated to the Committees.

- **Risk and Cybersecurity Committee**: Oversees risks related to the Company's key strategic, enterprise, and cybersecurity risks, including climate change, workplace and product safety, and privacy.

- Audit Committee: Oversees risks related to (i) financial reporting, internal disclosure controls (including with respect to ESG issues), and auditing matters; and (ii) legal, regulatory, and compliance programs. . . .

120.   In a section titled "Corporate Governance," the 2022 Proxy also touted the Board's

role in ensuring the Company maintained proper internal controls, among other things, stating:

GM is governed by a Board of Directors and Committees of the Board that meet throughout the year. The Board is elected by our shareholders to oversee and provide guidance on the Company's business and affairs. It is the ultimate decision-making body of the Company, except for those matters reserved for shareholders by law or pursuant to the Company's governance documents. Among other things, the Board oversees Company strategy and execution of the strategic plan. ***In addition, it oversees management's proper safeguarding of the assets of the Company, maintenance of appropriate financial and other internal controls, compliance with applicable laws and regulations, and proper governance***. The Board is committed to sound corporate governance policies and practices that are designed and routinely assessed to enable the Company to operate its business responsibly, with integrity, and to position GM to compete more effectively, sustain its success, and build long-term shareholder value.

(Emphasis added).

121.   The 2022 Proxy also contained a section on GM's Code of Conduct, stating:

The Board is committed to the highest legal and ethical standards in fulfilling its responsibilities. We have adopted a code of business conduct and ethics, "Winning with Integrity," that applies to everyone in our Company, at every level, including employees, executives, Board members and, as applicable, subsidiaries that GM controls. This Code of Conduct forms the foundation for compliance with corporate policies and procedures and creates a Company-wide focus on uncompromising integrity in every aspect of our operations. It embodies our expectations on a number of topics, including workplace and vehicle safety; DE&I; conflicts of interest; protection of confidential information; insider trading; competition and fair dealing; human rights; community involvement and corporate citizenship; political activities and

lobbying; preservation and use of Company assets; and compliance with laws and regulations. Employees are expected to report any conduct that they believe in good faith to be an actual or apparent violation of our Code of Conduct. The Code of Conduct is available at investor.gm.com/resources.

122.    On June 13, 2022, the Company held its Annual Meeting for shareholders, where

Defendant Barra stated:

> As I mentioned in my business remarks, Cruise received a final permit i[t] needed
> from the California Public Utilities Commission to charge for rides. So, that means
> Cruise is now officially the first and only company to operate a commercial
> driverless ride-hail service in a major US city.

123.    On July 26, 2022, the Company filed its quarterly report for the period ended June

30, 2022 with the SEC (the "2Q22 10-Q"). In the 2Q22 10-Q, the Company touted the progress of

Cruise and its AV testing, stating:

> In 2021, Cruise received a driverless test permit from the California Public Utilities
> Commission (CPUC) to provide unpaid rides to the public in driverless vehicles
> and received approval of its Autonomous Vehicle Deployment Permit from the
> California Department of Motor Vehicles to commercially deploy driverless AVs.
> In June 2022, Cruise received the first ever Driverless Deployment Permit granted
> by the CPUC, which allows them to charge a fare for the driverless rides they are
> providing to members of the public in certain parts of San Francisco.

124.    The 2Q22 10-Q was accompanied by SOX Certifications made by Defendants

Barra and Jacobson, wherein they attested to the accuracy of the 2Q22 10-Q.

125.    On September 12, 2022, Defendant Vogt attended a conference hosted by Goldman

Sachs, wherein he stated:

> [W]e've done some great work on the regulatory front. It took us 33 months to get
> all the permits necessary for commercial operation in California. And I think along
> that way, we built a lot of credibility and trust. It might have helped because to get
> the permits for our next city, it took three weeks. So three weeks, 33 months.

126.    On October 25, 2022, GM hosted an earnings call for investors and analysts to

discuss the Company's financial results for the third quarter of 2022 (the "3Q22 Earnings Call").

During the 3Q22 Earnings Call, Defendant Barra highlighted Cruise's progress, stating that

"Cruise has begun its expansion into Austin and Phoenix" and that "the Cruise team in San

Francisco continuous to make rapid progress on autonomous vehicles."

41

127.    Also during the 3Q22 Earnings Call, Defendant Vogt touted the commercialization

of Cruise AVs, stating:

> I guess, as I mentioned the last eight years have been this R&D phase. You got to
> get the technology to work before you can scale it. And we crossed that critical
> inflection point when we did our first driverless deployment in a major urban
> market like that was the point at which this turned from a binary problem, like does
> the tech exist or does it not, to a scaling problem, which is how quickly can we light
> up new markets, how quickly can we build vehicles. And really it was that
> foundational work that we've done over the last eight years, kind of, it's a tip in the
> iceberg situation. The majority of it is below the surface and now you're just seeing
> the very tip with our service that's at this point still just a few months old.

128.    On the same day, the Company filed its quarterly report for the period ended

September 30, 2022 on a Form 10-Q with the SEC (the "3Q22 10-Q"). The 3Q22 10-Q again

highlighted the progress made with Cruise's driverless fleet in California, stating:

> In 2021, Cruise received a driverless test permit from the California Public Utilities
> Commission (CPUC) to provide unpaid rides to the public in driverless vehicles
> and received approval of its Autonomous Vehicle Deployment Permit from the
> California Department of Motor Vehicles to commercially deploy driverless AVs.
> In June 2022, Cruise received the first ever Driverless Deployment Permit granted
> by the CPUC, which allows them to charge a fare for the driverless rides they are
> providing to members of the public in certain parts of San Francisco.

129.    The 3Q22 10-Q was accompanied by SOX Certifications made by Defendants

Barra and Jacobson, wherein they attested to the accuracy of the 3Q22 10-Q.

130.    On January 31, 2023, the Company filed its annual report for 2022 on a Form 10-

K with the SEC (the "2022 10-K"). The 2022 10-K touted Cruise's progress, stating:

> In September 2021, Cruise began operating a driverless ride hail service in San
> Francisco, California, and in June 2022, began charging the public for driverless
> rides. Cruise continues to make regulatory progress in California. In December
> 2022, Cruise received regulatory approval to expand its operational design domain
> in California. Cruise is also seeking regulatory approval to add the Cruise Origin to
> its driverless test permit. Additionally, in September 2022, Cruise acquired
> regulatory permits to operate driverless ride hail services in Phoenix, Arizona and
> began pursuing ride hail operations in Austin, Texas. Given the potential of all-
> electric self-driving vehicles to help save lives, reshape our cities and reduce
> emissions, the goal of Cruise is to deliver its self-driving services as soon as

possible, but as Cruise continues to expand and scale its operations, safety will continue to be the gating metric, supported by Cruise's Safety Management System and its other risk identification, assessment and mitigation processes.

131.    The 2022 10-K also stated:

Gated by safety and regulation, Cruise continues to make significant progress towards commercialization of a network of on-demand AVs in the United States and globally. In 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles and received approval of its Autonomous Vehicle Deployment Permit from the California Department of Motor Vehicles to commercially deploy driverless AVs. In June 2022, Cruise received the first ever Driverless Deployment Permit granted by the CPUC, which allows them to charge a fare for the driverless rides they are providing to members of the public in certain parts of San Francisco. Additionally, in September 2022, Cruise acquired regulatory permits to operate driverless ride hail services in Phoenix, Arizona and began pursuing ride hail operations in Austin, Texas. GM and Cruise are also awaiting a decision on an exemption petition that was filed with NHTSA seeking regulatory approval for the deployment of the Cruise Origin.

132.    The 2022 10-K was signed by Defendants Barra, Jacobson, Russo, Bhusri, Bush, Crevoiserat, Gooden, Jimenez, McNeill, Miscik, Schoewe, Stephenson, Tatum, and Wenig. The 2022 10-K was also accompanied by SOX Certifications made by Defendants Barra and Jacobson, wherein they attested to the accuracy of the 2022 10-K.

133.    On April 25, 2023, the Company filed a quarterly report for the period ended March 31, 2023 on a Form 10-Q with the SEC (the "1Q23 10-Q"). The 1Q23 10-Q contained the same statement on Cruise's progress as the 3Q22 10-Q, stating:

In 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles and received approval of its Autonomous Vehicle Deployment Permit from the California Department of Motor Vehicles to commercially deploy driverless AVs. In June 2022, Cruise received the first ever Driverless Deployment Permit granted by the CPUC, which allows them to charge a fare for the driverless rides they are providing to members of the public in certain parts of San Francisco.

134.    The 1Q23 10-Q was accompanied by SOX Certifications made by Defendants Barra and Jacobson, wherein they attested to the accuracy of the 1Q23 10-Q.

135.    On the same day, during its earnings call for investors and analysts to discuss GM's financial results for the first quarter of 2023, the Company presented its "Q1 2023 Earnings" presentation, which included a slide that revered GM for its "[l]eadership in [s]afe [d]eployment of ADAS and AV" and described Cruise as "L4" and touted GM as "the only automaker with both Level 2 and Level 4 AV technology offerings and a scalable vehicle built for autonomy ready for production."



## Leadership in Safe Deployment of ADAS and AV

| Super Cruise L2 | Ultra Cruise L2 | Cruise L4 |
|---|---|---|
| • First true hands-free driving-assistance technology for compatible roads<br>• Available on 22 GM models by end of 2023 globally<br>• Customers have driven more than 60M miles using Super Cruise | • Next-generation ADAS designed to enable hands-free driving in 95% of all driving scenarios<br>• Integrates a unique sensor suite, providing a 360-degree view<br>• The driver attention system will continue to play a key role | • All-electric, self-driving car service currently operating in San Francisco, Austin and Phoenix and growing service areas regularly<br>• Pioneering self-driving technology means taking on challenges in hardware, AI, embedded systems, simulation, and infrastructure |

GM is the only automaker with both Level 2 and Level 4 AV technology offerings and a scalable vehicle built for autonomy ready for production

11

136.    The Q1 2023 Earnings presentation also touted Cruise's growth, stating that the "[f]irst million fully driverless miles took 15 months to achieve" and that Cruise "[s]urpassed 1.5M driverless miles ~90 days after reaching first million."



137.    On April 28, 2023, the Company filed its annual proxy statement for 2023 on a Schedule 14A with the SEC (the "2023 Proxy"). The 2023 Proxy highlighted the Board and its Committees' risk oversight functions, stating, in relevant part:

Role of the Board of Directors

The Board has overall responsibility for risk oversight and focuses on the most significant risks facing the Company. The Board discharges its risk oversight responsibilities, in part, through delegation to its committees. The Company's risk governance is facilitated through a top-down and bottom-up communication structure, with the tone established at the top by Ms. Barra, our Board Chair and CEO, and other members of management, specifically the Senior Leadership Team. The Senior Leadership Team also utilizes our Risk Advisory Council, an executive-level body with delegates from each business unit, to discuss and monitor the most significant enterprise and emerging risks in a cross-functional setting. They are tasked with championing risk management practices and integrating them into their functional or regional business units.

Role of the Board Committees

Each of the Board's committees has a critical role to play in the overall execution of the Board's risk oversight duties. The Board delegates oversight for certain risks to each committee based on the risk categories relevant to the subject matter of the committee. The Risk and Cybersecurity Committee Chair coordinates with the

45

chairs of the other committees to support them in managing the relationship between risk management policies and practices and their respective oversight responsibilities. The Risk and Cybersecurity Committee also assists the Board by monitoring the overall effectiveness of the Company's risk management framework and processes. For example, GM's Strategic Risk Management team conducts an annual risk assessment, which the Risk and Cybersecurity Committee reviews and receives detailed management updates regularly throughout the year.

Below is a summary of the key risk oversight responsibilities that the Board has delegated to its committees.

- **Audit Committee**: Oversees risks related to (i) financial reporting, internal disclosure controls (including with respect to ESG issues, reporting, and disclosures), and auditing matters; and (ii) legal, regulatory, and compliance programs. . . .

- **Risk and Cybersecurity Committee:** Oversees risks related to the Company's key strategic, enterprise, and cybersecurity risks, including climate change, workplace and product safety, and privacy.

138.    In a section titled "Corporate Governance," the 2023 Proxy also touted the Board's

role in ensuring the Company maintained proper internal controls, among other things, stating:

GM is governed by a Board of Directors and committees of the Board that meet throughout the year to ensure that the CEO and other senior management are operating the Company in a competent and ethical manner. The Board is elected by our shareholders to oversee and provide guidance on the Company's business and affairs. It is the ultimate decision-making body of the Company, except for those matters reserved for shareholders by law or pursuant to the Company's corporate governance documents. Among other things, the Board oversees the Company's strategy and execution of the strategic plan. In addition, *it oversees management's proper safeguarding of the assets of the Company, maintenance of appropriate financial and other internal controls, compliance with applicable laws and regulations, and proper governance*. The Board is committed to sound corporate governance policies and practices that are designed and routinely assessed to enable the Company to operate its business responsibly, with integrity, and to position GM to compete more effectively, sustain its success, and build long-term shareholder value.

(Emphasis added).

139.    The 2023 Proxy also included a section on the Company's Code of Conduct,

stating, in part:

46

The Board is committed to the highest legal and ethical standards in fulfilling its responsibilities. We have adopted a code of business conduct and ethics, "Winning with Integrity," that applies to everyone in our Company, at every level, including employees, executives, Board members and, as applicable, subsidiaries that GM controls. This Code of Conduct forms the foundation for compliance with corporate policies and procedures and creates a Company-wide focus on uncompromising integrity in every aspect of our operations. It embodies our expectations on a number of topics, including workplace and vehicle safety; DE&I; conflicts of interest; protection of confidential information; insider trading; competition and fair dealing; human rights; community involvement and corporate citizenship; political activities and lobbying; preservation and use of Company assets; and compliance with laws and regulations. Employees are expected to report any conduct that they believe in good faith to be an actual or apparent violation of our Code of Conduct. The Code of Conduct is available at *investor.gm.com/esg*.

140.    On June 15, 2023, Defendant Jacobson attended a conference hosted by Deutsche Bank on behalf of the Company, wherein Jacobson highlighted Cruise as "Level 4" autonomy, stating:

Well, I think one of the things that I'd chuckle at, as I'm watching TV is all the discussion about AI and what the future is. And we probably have one of the most sophisticated AI platforms and autonomous driving that exists anywhere. And the scaling that's occurring with Cruise, they eclipsed 1 million miles earlier this year and then 90 days later, eclipsed 2 million miles. So they're in a position where they're in really rapid growth and deployment of the AI. And ***these miles are all driverless, so it's not like we're Level 2. We're full Level 4, no driver in the vehicle at all.***

(Emphasis added).

141.    During the same conference, Defendant Jacobson also stated:

I mean, between not just the rideshare applications, but delivery, but personal autonomous vehicles, and ultimately, where that's going, nobody has a cost-effective Level 4 solution that's out there for customers. ***But we've got the Level 4 technology***. As we've said before, we started with the strategy of saying, let's solve the problem. The problem is the most difficult thing to solve, which is get the tech right. Once you get the tech right, you can bring the cost down.

(Emphasis added).

142.    On July 25, 2023, the Company filed a quarterly report for the period ended June 30, 2023 on a Form 10-Q with the SEC (the "2Q23 10-Q"). The 2Q23 10-Q stated:

In 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles and received approval of its Autonomous Vehicle Deployment Permit from the California Department of Motor Vehicles to commercially deploy driverless AVs. In June 2022, Cruise received the first ever Driverless Deployment Permit granted by the CPUC, which allows it to charge a fare for the driverless rides it is providing to members of the public in certain parts of San Francisco.

143.   The 2Q23 10-Q was accompanied by SOX Certifications made by Defendants Barra and Jacobson, wherein they attested to the accuracy of the 2Q23 10-Q.

144.   The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (i) Cruise's AV technology had not reached "Level 4" autonomy; (ii) the regulatory approval of Cruise's AVs and driverless testing permits were based on GM and Cruise overstating the autonomy of the vehicles; (iii) GM and Cruise could not operate a revenue-generating, fully driverless robotaxi business without additional research and development; (iv) GM failed to maintain adequate internal controls over Cruise and the Company's public reporting; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

***The Truth Emerges***

145.   The truth began to emerge when, on October 2, 2023, at approximately 9:30p.m., a human-driven vehicle struck a pedestrian in San Francisco, California, while traveling in the lane immediately to the left of a Cruise AV, and launched the pedestrian into the pathway of a Cruise AV traveling in autonomous mode.  The Cruise AV then hit the pedestrian and came to an initial stop. However, the pedestrian was pinned beneath the Cruise AV, and while the Cruise AV's camera could see the pedestrian, the car began driving again with the pedestrian underneath,

dragging them approximately twenty feet and causing serious injuries.

146.    On the news of the Crash, the Company's stock price declined $1.09 per share, or approximately 3.4%, to close at $31.38 per share on October 3, 2023.

147.    However, the Company, directly and through Cruise, repeatedly downplayed the severity of the Crash and continued to tout the Cruise AVs as safe. Indeed, in a flurry of news reporting and public statements immediately after the Crash, Cruise did not disclose the full extent of the Crash. For instance, in a CNN article published the day after the crash, a Cruise spokesperson was quoted as stating that "A human-driven vehicle struck a pedestrian while traveling in the lane immediately to the left of a Cruise AV[.] The initial impact was severe and launched the pedestrian directly in front of the AV. The AV then braked aggressively to minimize the impact."[13] However, the spokesperson failed to mention that, after braking, the Cruise proceeded to drive (in an attempted pullover maneuver) and dragged the pedestrian.

148.    In its statement posted to X on October 3, 2023, by Cruise, Cruise stated:

At approximately 9:30 pm on October 2, a human-driven vehicle struck a pedestrian while traveling in the lane immediately to the left of a Cruise AV. The initial impact was severe and launched the pedestrian directly in front of the AV. The AV then braked aggressively to minimize the impact. The driver of the other vehicle fled the scene, and at the request of the police the AV was kept in place.

149.    Additionally, a KRON4 article, published on October 3, 2023, revealed that "[a] Cruise representative allowed KRON4 to view video footage recorded by its AV involved in the accident. The video confirmed that a human-driven car struck the woman first before she was

---

[13] Andy Rose et al., *A Woman was Found Trapped Under Driverless Car. It Wasn't the First Car to Hit Her*, CNN (Oct. 3, 2023), https://www.cnn.com/2023/10/03/tech/driverless-car-pedestrian-injury/index.html.

thrown directly into the path of the Cruise car."[14] In the list of bullet points summarizing what was in the video, there is no mention of the Cruise car driving over the pedestrian and dragging her in the attempted pullover maneuver.

150.    Thereafter, the Company continued to tell investors that the AVs were safe. For instance, during GM's earnings call for investors and analysts on October 24, 2023 to discuss the Company's financial results for the third quarter of 2023 (the "3Q23 Earnings Call"), Defendant Barra touted Cruise's AV technology, stating, in relevant part:

> So, now let's turn to Cruise. Since the early days of our company, GM has been defining the future of transportation. And today, that's more true than ever with Cruise. In February, we celebrated Cruise becoming the first company to eclipse 1 million driverless miles. Fast-forward to today and they have logged more than 5 million miles, and they continue to expand. Just last week, we announced that GM and Cruise are working with Honda to bring driverless rides to Tokyo in early 2027.
>
> We'll do that with our Origin, the world's first-ever vehicle purpose-built for autonomous driving on public roads. As Cruise continues to push the boundaries of what AV technology can deliver society, safety is always at the forefront. And this is something they are continuously improving. In fact, it's our zero crash vision that keeps us pressing forward.
>
> And we know from the data that Cruise AVs are involved in far fewer collisions than human drivers. This remains the focus of their ongoing discussions with government partners and regulators at the federal and state levels.

151.    Additionally, during the 3Q23 Earnings Call, Defendant Barra touted the driverless Cruise technology's safety, stating "[a]s I said in my remarks, *it is safer than a human driver*, and it's constantly improving and getting better, and that's what we're focused on doing." (Emphasis added).

152.    However, on the same day—October 24, 2023—the CDMV issued the CDMV

---

[14] Amy Larson & Haaziq Madyun, *Driverless Cruise Vehicle's Cameras Recorded Moment Woman was Struck in San Francisco*, KRON4 (Oct. 3, 2023), https://www.kron.com/news/bay-area/driverless-cruise-cars-cameras-recorded-moment-woman-was-struck/.

Order and suspended Cruise's driverless testing permits. The CDMV stated that the suspension was based on the following:

> 13 CCR §228.20 (b) (6) – Based upon the performance of the vehicles, the Department determines the manufacturer's vehicles are not safe for the public's operation.
>
> 13 CCR §228.20 (b) (3) – The manufacturer has misrepresented any information related to safety of the autonomous technology of its vehicles.
>
> 13 CCR §227.42 (b) (5) – Any act or omission of the manufacturer or one of its agents, employees, contractors, or designees which the department finds makes the conduct of autonomous vehicle testing on public roads by the manufacturer an unreasonable risk to the public.
>
> 13 CCR §227.42 (c) – The department shall immediately suspend or revoke the Manufacturer's Testing Permit or a Manufacturer's Testing Permit – Driverless Vehicles if a manufacturer is engaging in a practice in such a manner that immediate suspension is required for the safety of persons on a public road.[15]

153.    CalMatters reported that the CDMV suspension notices sent to Cruise noted that Cruise showed the CDMV and California Highway Patrol video from the Crash that ended with the autonomous vehicle stopping after it braked when the pedestrian fell into its path after being hit by another vehicle and that the CDMV was not made aware that the Cruise vehicle then tried to pull over while the pedestrian was underneath it.[16] The suspension notice stated that "[t]he department only learned of the AV's subsequent movement via discussion with another government agency." The CDMV stated that it requested additional footage from Cruise and received it on October 13, 2023.

154.    Also on October 24, 2023, the California Public Utilities Commission ("CPUC") suspended Cruise's analogous driverless permit. *Id.*

---

[15] California Department of Motor Vehicles, *supra* note 5.

[16] Levi Sumagaysay, Two State Agencies Ground Cruise Cars for Public Safety, CalMatters (Oct. 24, 2023), https://calmatters.org/economy/2023/10/driverless-cars-cruise-dmv/.

155.     Cruise published a blog post on October 24, 2023, titled "A Detailed Review of the Recent SF Hit-and-Run Incident," where Cruise publicly acknowledged for the first time that following the collision with the pedestrian, the AV "then attempted to pull over to avoid causing further road safety issues, pulling the individual forward approximately 20 feet."[17]

156.     On this news, GM's stock price declined $0.66 per share, or approximately 2.3%, to close at $28.56 per share on October 24, 2023.

157.     Two days later, on October 26, 2023, the NHTSA released a letter the agency sent to Cruise on October 20, 2023, wherein the NHTSA revealed that it was investigating five reports of Cruise AVs engaging in inappropriately hard braking that resulted in collisions.[18] Specifically, the NHTSA said that in December it had "opened a formal safety probe into Cruise after reports of three crashes in which Cruise vehicles were struck from behind by other vehicles after the autonomous vehicles braked quickly resulting in two injuries" and that as of October 20th, NHTSA had received "two additional crash reports involving Cruise vehicles that braked 'with no stated obstacles ahead.'"

158.     Later that same day, Cruise announced via X that it would pause all of its AV operations across the country. Specifically, Cruise stated that "the most important thing for us right now is to take steps to rebuild public trust . . . . In that spirit, we have decided to proactively pause driverless operations across all of our fleets while we take time to examine our processes, systems, and tools."[19]

---

[17] Upon information and belief, this blog post is no longer available on Cruise's or GM's website.

[18] WSAU, *supra* note 6.

[19] David Shepardson, *GM Cruise Unit Suspends All Driverless Operations After California Ban*, Reuters (Oct. 27, 2023), https://www.reuters.com/business/autos-transportation/us-auto-safety-

159. On this news, GM's stock price declined $1.33 per share, or approximately 4.7%, to close at $27.22 per share on October 27, 2023.

160. Finally, on November 8, 2023, the entire truth was revealed when it was announced that Cruise issued the Recall, which impacted its entire fleet of 950 driverless cars across the U.S.[20] The Recall notice dealt with the Cruise AVs collision detection subsystems, which are responsible for detecting collisions and choosing post-collision responses. The Recall addresses "circumstances when the software may cause the Cruise AV to attempt to pull over out of traffic instead of remaining stationary 'when a pullover is not the desired post-collision response.'"

161. On news of the Recall, GM's stock price declined $0.91 per share, or approximately 3%, to close at $26.65 on November 9, 2023.

**Post-Relevant Period Events**

162. Following the Relevant Period, Cruise released the Quinn Report, which was published on January 24, 2024, that presented the findings of an investigation into the Crash. The Quinn report revealed that: (i) Defendant Vogt "personally wanted to see and authorize the final cut of any video or media statement" disseminated to the media; (ii) Vogt and other Cruise executives became aware the morning after the crash that the Cruise AV dragged the pedestrian after braking; and (iii) despite the Defendants' knowledge of these details, Cruise disseminated misleading video footage and statements to the public that purposefully omitted the dragging of the pedestrian and the pullover maneuver.

163. Additionally, in connection with the Crash, Cruise has faced legal and regulatory

---

agency-investigating-two-new-gm-cruise-crash-reports-2023-10-26/#:~:text=3.,the%20complete%20video%20multiple%20times.%22

[20] Shepardson, *supra* note 7.

investigations and fines. According to the 2024 10-K:

> Over the last year, we have engaged and actively cooperated with certain federal and state agencies who opened investigations or made inquiries to us and Cruise in connection with an accident involving a Cruise robotaxi in October 2023. We and Cruise have resolved the investigations and inquiries by the National Highway Traffic Safety Administration (NHTSA), the U.S. Department of Justice and the California Public Utilities Commission (CPUC). Specifically, in July 2024, Cruise entered into a settlement agreement with the CPUC that imposed a $112,500 fine on Cruise and various reporting obligations. In September 2024, Cruise and NHTSA executed a Consent Order, which imposed a $1.5 million fine on Cruise and requires enhanced reporting and engagement with NHTSA for two years (with an optional third year at NHTSA's discretion). In November 2024, Cruise entered into a Deferred Prosecution Agreement (DPA) with the U.S. Attorney's Office for the Northern District of California relating to the October 2023 accident. Under the terms of the DPA, Cruise admitted to one count of submitting a false report to a federal agency and paid a $500,000 monetary penalty. The government will not pursue an indictment or prosecution so long as Cruise complies with the terms of the DPA over the next three years by undertaking certain remedial measures, maintaining a safety compliance program and submitting reports to the government no less than annually. GM is neither a party nor a signatory to these agreements. GM is neither a party nor a signatory to these agreements.

***Stock Repurchases During the Relevant Period***

164.     According to the Company's public filings, while the price of Company stock was artificially inflated due to the materially false and misleading statements detailed above, the GM Defendants caused the Company to repurchase approximately 75 million shares of its own stock, for a total of over $3.2 billion, during the Relevant Period.

165.     According to the Company's public filings with the SEC, GM made the following repurchases of its own stock during the Relevant Period:

| Dates of Stock Repurchase | Number of Shares Repurchased | Average Price Per Share on Date of Repurchase | Total Cost of Repurchase |
|---|---|---|---|
| February 1, 2021 to February 28, 2021 | 2,321,842 | $53.60 | $124,450,731.20 |
| April 1, 2021 to April 30, 2021 | 182,497 | $57.80 | $10,548,326.60 |
| May 1, 2021 to May 31, 2021 | 18,254 | $57.41 | $1,047,962.14 |

| July 1, 2021 to July 31, 2021 | 3,372 | $59.05 | $199,116.60 |
| January 1, 2022 to January 31, 2022 | 7,227 | $62.98 | $455,156.46 |
| February 1, 2022 to February 28, 2022 | 2,324,296 | $48.83 | $113,495,373.68 |
| April 1, 2022 to April 30, 2022 | 36,046 | $42.96 | $1,548,536.16 |
| July 1, 2022 to July 31, 2022 | 5,813 | $32.19 | $187,120.47 |
| August 1, 2022 to August 31, 2022 | 15,499,447 | $39.32 | $609,438,256.04 |
| September 1, 2022 to September 30, 2022 | 22,450,580 | $39.74 | $892,186,049.20 |
| January 1, 2023 to January 31, 2023 | 22,216 | $33.97 | $754,677.52 |
| February 1, 2023 to February 28, 2023 | 6,180,726 | $41.24 | $524,893,140.24 |
| March 1, 2023 to March 31, 2023 | 5,276,241 | $38.06 | $200,813,732.46 |
| April 1, 2023 to April 30, 2023 | 27,329 | $36.68 | $1,002,427.72 |
| May 1, 2023 to May 31, 2023 | 7,525,921 | $33.22 | $250,011,095.62 |
| June 1, 2023 to June 30, 2023 | 6,881,651 | $36.33 | $229,571,877.36 |
| July 1, 2023 to July 31, 2023 | 4,248,465 | $38.45 | $163,353,479.25 |
| August 1, 2023 to August 31, 2023 | 2,326,203 | $37.83 | $88,000,259.49 |

166.    Given that the price of GM stock was $26.65 per share after the corrective disclosures on November 9, 2023, the true value of the 75,338,126 repurchased shares was roughly $2 billion. Accordingly, the GM Defendants caused the Company to overpay by approximately *$1.2 billion* to repurchase these shares during the Relevant Period.

**The Securities Class Action**

167.    As a direct and proximate result of the Defendants' misconduct, the Securities Class Action was filed against the Company, Cruise, and Defendants Jacobson, Vogt, Ammann, Parks, and West.

168.    The plaintiffs in the Securities Class Action filed an amended complaint on May 13, 2024. Securities Class Action, ECF No. 23 (the "Securities Class Action AC"). On August 2, 2024, the defendants in the Securities Class Action filed motions to dismiss the Securities Class Action AC. Securities Class Action, ECF Nos. 31, 32 (the "Motions to Dismiss").

169.    On March 28, 2025, the court in the Securities Class Action entered an order denying the Motions to Dismiss in part. Securities Class Action, ECF No. 53 (the "Securities Class Action MTD Order").

170.    The Securities Class Action MTD Order stated, in relevant part, that the plaintiffs "adequately plead falsity with respect to their claims based on defendants' 'Level 4' statements." Securities Class Action MTD Order at 27. The Securities Class Action MTD Order also found that plaintiffs adequately pled falsity for some of the "permit statements," which were statements regarding the approval of permits for Cruise's AV testing. *Id.* at 13.

171.    Additionally, the Securities Class Action MTD Order held that the statements conveying that Cruise's AV technology had reached the point where Cruise could already operate a revenue-generating, fully driverless robotaxi business without additional research and development (aka the "commercialization statements") were not dismissed because "defendants did not assert arguments as to the [] statements [and] waived such arguments." *Id.* at 12, 61.

172.    The Securities Class Action is still pending and has exposed, and will continue to expose, the Company to massive class-wide liability.

***Harm to the Company***

173.    As a direct and proximate result of the Defendants' misconduct, GM has lost and expended, and will lose and expend, billions of dollars.

174.    Such expenditures include, but are not limited to, the legal fees associated with the

Securities Class Action filed, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

175.     Such expenditures also include, but are not limited to, significant compensation and benefits paid to the GM Defendants who breached their fiduciary duties to the Company, as well as the billions of dollars the GM Defendants caused the Company to spend in repurchasing its stock at artificially inflated prices during the Relevant Period.

176.     Such losses include, but are not limited to, the losses suffered by GM as a result of its investment in Cruise.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

177.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the GM Defendants, Cruise, and the Cruise Defendants.

178.     GM is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

179.     Plaintiff is a current shareholder of GM and was a continuous shareholder of the Company during the period of the Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

180.     A pre-suit demand on the Board of GM is futile and, therefore, excused.  At the time this action was commenced, the thirteen-person Board consisted of Defendants Barra, Bush, Crevoiserat, Gooden, Jimenez, McNeill, Miscik, Russo, Schoewe, Tatum, Tighe, and Wenig (the "Director Defendants") and non-party Alfred F. Kelly Jr. As set forth below, all of the Director Defendants are incapable of making an independent and disinterested decision to institute and

vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

181.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

182.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

183.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

184.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations, including the operations of Cruise, and the material events giving rise to these claims. Specifically, as Board members of GM, the Director Defendants knew, or should have known, the material facts surrounding Cruise's AV technology and testing and internal control mechanisms.

185.    Defendant Barra is not disinterested or independent. Defendant Barra serves as the Company's CEO and as Chair of the Board. Thus, the Company admits that Defendant Barra is a

non-independent director. Furthermore, Defendant Barra is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

186.    Moreover, Defendants Barra, Russo, Gooden, Jimenez, Miscik, Schowe, Tatum, and Wenig signed the 2021 10-K. Defendants Barra, Jacobson, Russo, Bush, Crevoiserat, Gooden, Jimenez, McNeill, Miscik, Schoewe, Tatum, and Wenig signed the 2022 10-K. Defendants Barra, Jacobson, Russo, Bush, Crevoiserat, Gooden, Jimenez, McNeill, Miscik, Schoewe, Tatum, Tighe, and Wenig signed the 2023 10-K. Accordingly, all of the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus, demand upon them is futile, and therefore excused.

187.    Furthermore, Defendants Barra, Bush, Gooden, Jimenez, Miscik, Russo, Schoewe, Tatum, and Wenig each solicited the 2021 Proxy, which led to the reelection of each of the same Defendants, allowing them to continue breaching their fiduciary duties to the Company.

188.    Defendants Barra, Bush, Gooden, Jimenez, Miscik, Russo, Schoewe, Tatum, and Wenig each solicited the 2022 Proxy, which led to the reelection of each of these same Defendants, allowing them to continue breaching their fiduciary duties to the Company.

189.    Defendants Barra, Bush, Crevoiserat, Gooden, Jimenez, McNeill, Miscik, Russo, Schoewe, Tatum, and Wenig each solicited the 2023 Proxy, which led to the reelection of each of these same Defendants, allowing them to continue breaching their fiduciary duties to the Company, and to the election of Defendant Tighe to the Board.

190.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the

Company.

191.     Furthermore, the Director Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other.

192.     The Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, the issues with Cruise's AV technology, and the details surrounding the Crash, and failed to make a good faith effort to correct these problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

193.     Furthermore, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

194.     The Director Defendants failed to take any action to sue Cruise and/or the Cruise Defendants for their wrongdoing detailed herein. Throughout the Relevant Period, GM owned a majority stake in Cruise, described Cruise as GM's "global segment," and included Cruise's financial metrics in the Company's public reports at all relevant times. As such, GM was a controller of Cruise and Cruise and its operations fell under the direct purview of the Director Defendants. Accordingly, by failing to take action against Cruise, the Director Defendants breached their fiduciary duties, are not disinterest, and demand upon them is futile, and thus excused.

195.     Moreover, Director Defendants Bush, McNeill, and Wenig each serve on the board of directors of Cruise. As such, Defendants Bush, McNeill, and Wenig face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

196.     Defendants Schoewe, Bush, Gooden, Tatum, Crevoiserat (the "Audit Defendants")

served on the Company's Audit Committee during the Relevant Period, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

197.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

198.    Accordingly, a pre-suit demand on the Board is futile and excused.

## COUNT I

### Against the GM Defendants for Violations of § 14(a)
### of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)

199.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

200.    The GM Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. §

78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

201.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

202.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

203.    The GM Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2021 Proxy, 2022 Proxy, and the 2023 Proxy (collectively, the "Proxy Statements"), which were all filed with the SEC. As alleged above, the Proxy Statements were materially false and misleading because they failed to disclose, *inter alia*: (i) GM did not have adequate internal controls in place over Cruise, the Company's operations, or the Company's and Cruise's public reporting; and (ii) the Board and its committees were not properly overseeing risks to the Company, including risks associated with Cruise AVs.

204.    The misrepresentations and omissions in the Proxy Statements were material to Company stockholders. Specifically, the misrepresentations and omissions were material to

Company stockholders in voting on matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, the reelection of certain GM Defendants.

205.     The materially false and misleading statements contained in the 2021 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Barra, Bush, Gooden, Jimenez, Mendillo, Miscik, Russo, Schoewe, Stephenson, Tatum, Wenig, and Whitman to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

206.     The materially false and misleading statements in the 2022 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Barra, Bhusri, Bush, Gooden, Jimenez, Miscik, Russo, Schoewe, Stephenson, Tatum, Wenig, and Whitman to the Board, allowing them to continue breaching their fiduciary duties to the Company.

207.     The materially false and misleading statements contained in the 2023 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Barra, Bhusri, Bush, Crevioserat, Gooden, Jimenez, McNeill, Miscik, Russo, Schoewe, Tatum, and Wenig to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and for the election of Defendant Tighe to the Board.

208.     The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the Proxy Statements.

209.     As a result of the GM Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

210.     Plaintiff, on behalf of the Company, has no adequate remedy at law

## COUNT II

**Against the GM Defendants for Violations of § 10(b)**
**of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5**

211.     Plaintiff incorporates by reference and realleges each and every allegation

63

contained above, as though fully set forth herein.

212.    The GM Defendants participated in a scheme with the purpose and effect of defrauding GM. Not only is GM now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon GM by the GM Defendants.

213.    During the Relevant Period, while the price of the Company's stock was artificially inflated as a result of the false and misleading statements issued, the GM Defendants caused the Company to overpay by approximately $1.2 billion to repurchase approximately 75 million shares of GM common stock.

214.    The GM Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

215.    The GM Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about GM not misleading.

216.    The GM Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the GM Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by GM.

217.    The GM Defendants acted with scienter during the Relevant Period, in that they

either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The GM Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

218.    The GM Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have caused the Company to expend over $3.2 billion in the repurchase of GM stock at artificially inflated prices and have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

219.    By virtue of the foregoing, the GM Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

220.    Plaintiff, on behalf of GM, has no adequate remedy at law.

## COUNT III

**Against the GM Defendants**
**For Violations of Section 20(a) of the Exchange Act**

251.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

252.    The GM Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the GM Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase GM stock at prices artificially inflated by those materially false and misleading statements.

253.    Plaintiff, on behalf of GM, has no adequate remedy at law.

## COUNT IV

### Against the GM Defendants for Breach of Fiduciary Duty

221.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

222.     The GM Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the GM Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

223.     The GM Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

224.     The GM Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the GM Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

225.     Specifically, the GM Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia,* that: (i) Cruise's AV technology had not reached "Level 4" autonomy; (ii) the regulatory approval of Cruise's AVs and driverless testing permits were based on GM and Cruise overstating the autonomy of the vehicles; (iii) GM and Cruise could not operate a revenue-

generating, fully driverless robotaxi business without additional research and development; (iv) GM failed to maintain adequate internal controls over Cruise and the Company's public reporting; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

226.    In further breach of their fiduciary duties, the GM Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

227.    Moreover, by virtue of the fact that GM owned and controlled Cruise at all relevant times and reported that Cruise was the Company's global segment, the GM Defendants owed fiduciary duties to the Company's shareholders to oversee Cruise and its business, operations, management, internal controls, and public statements, including the dissemination of false and/or materially misleading information regarding GM's and Cruise's business, prospects, and operations, including the Crash, and had a duty to cause GM to disclose in its filings with the SEC all of the facts described in this Complaint regarding Cruise and the Crash that the Company failed to disclose.

228.    Additionally, the GM Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices during the Relevant Period.

229.    As a direct and proximate result of the GM Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

230.    As a result of the misconduct alleged herein, the GM Defendants are liable to the Company. As a direct and proximate result of the GM Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and

goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, money lost in its investment in Cruise, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

231.    Plaintiff, on behalf of GM, has no adequate remedy at law.

## COUNT V

### Against the Cruise Defendants for Breach of Fiduciary Duty

232.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

233.    At all relevant times, GM owned and controlled Cruise. As of December 31, 2024, GM owned 97% of Cruise. Additionally, GM reports that Cruise is GM's "global segment" and reports Cruise's financial metrics in the Company's public SEC filings. Moreover, three current directors of GM also serve on the Board of Cruise.

234.    As such, Cruise and the Cruise Defendants, owed GM and its shareholders fiduciary duties of care and loyalty, which include an obligation to act in good faith.

235.    Cruise and the Cruise Defendants knowingly breached their fiduciary duty to GM by issuing materially false and misleading statements to the public regarding Cruise's AV technology and the Crash, as set forth above.

236.    Plaintiff, on behalf of GM, has no adequate remedy at law.

## COUNT VI

### Against the Cruise Defendants for Aiding and
### Abetting Breach of Fiduciary Duties

237.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

238.    Each member of the GM Board had a fiduciary relationship with GM and owed GM fiduciary duties. As set forth above, the GM Board breached its fiduciary duties to GM.

239.    Cruise and the Cruise Defendants knowingly participated in the GM Defendants' breach of fiduciary duties by aiding and abetting the issuance of the materially false and misleading statements set forth above.

240.    Cruise and the Cruise Defendants profited through aiding and abetting those breaches of fiduciary duties and GM was damaged as a result.

241.    Plaintiff, on behalf of GM, has no adequate remedy at law.

## COUNT VII

### Against the GM Defendants for Unjust Enrichment

242.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

243.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the GM Defendants were unjustly enriched at the expense of, and to the detriment of, GM.

244.    The GM Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from GM that was tied to the performance or artificially inflated valuation of GM, or received compensation that was unjust in light of the GM Defendants' bad faith conduct.

245.    Plaintiff, as a shareholder and a representative of GM, seeks restitution from the GM Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the GM Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

246.    Plaintiff, on behalf of GM, has no adequate remedy at law.

## COUNT VIII

### Against the GM Defendants for Waste of Corporate Assets

247.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

248.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.   It resulted in continuous, connected, and ongoing harm to the Company.

249.    As a result of the misconduct described above, the GM Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; (ii) causing the Company to repurchase millions of shares of its own common stock at artificially inflated prices; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

250.    As a result of the waste of corporate assets, the GM Defendants are liable to the Company.

251.    Plaintiff, on behalf GM, has no adequate remedy at law.

## COUNT IV

### Against the GM Defendants for Gross Mismanagement

252.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

253.    By their actions alleged herein, the GM Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of GM in a manner consistent with the operations of a publicly-held corporation.

254. As a direct and proximate result of the GM Defendants' gross mismanagement and breaches of duty alleged herein, GM has sustained, and will continue to sustain, significant damages.

255. As a result of the misconduct and breaches of duty alleged herein, the GM Defendants are liable to the Company.

256. Plaintiff, on behalf of GM, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Defendants do not participate therein or benefit thereby;

B.     Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.     Awarding punitive damages;

D.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: April 28, 2025

**FINK BRESSACK**

By:  */s/ David H. Fink*
 David H. Fink (P28235)
 Nathan J. Fink (P75185)
 38500 Woodward Avenue, Suite 350
 Bloomfield Hills, MI 48304
 Telephone: (248) 971-2500
 Email: dfink@finkbressack.com
 Email: nfink@finkbressack.com

**RIGRODSKY LAW, P.A.**
 Seth D. Rigrodsky (admission
 application to be submitted)
 Vincent A. Licata
 Leah B. Wihtelin (admission
 application to be submitted)
 825 East Gate Boulevard, Suite 300
 Garden City, NY 11530
 Telephone: (516) 683-3516
 Email: sdr@rl-legal.com
 Email: vl@rl-legal.com
 Email: lw@rl-legal.com

**GRABAR LAW OFFICE**
 Joshua H. Grabar (admission
 application to be submitted)
 One Liberty Place
 1650 Market Street, Suite 3600
 Philadelphia, PA 19103
 Telephone: (267) 507-6085
 Email: jgrabar@grabarlaw.com

 *Attorneys for Plaintiff*

## **VERIFICATION**

I, Lee Namiotka, have reviewed the allegations made in this Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of General Motors Company common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: 4/28/2025 _____

Signed by:

*Lee Namiotka*

9ADA57A5B84E436

LEE NAMIOTKA